# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CALIFORNIA COASTAL COMMISSION,<br><br>　　　　　　　　　　Plaintiff,<br><br>vs.<br><br>UNITED STATES DEPARTMENT OF THE NAVY; SECRETARY OF THE NAVY, Ray Mabus, in his official capacity; and MANCHESTER PACIFIC GATEWAY LLC ,<br><br>　　　　　　　　　　Defendants. | CASE NO. 13cv0178 JM(WNC)<br><br>ORDER DENYING MOTION TO AUGMENT ADMINISTRATIVE RECORD AND TO CONDUCT DISCOVERY |

Plaintiff California Coastal Commission ("CCC") moves to augment the administrative record and for leave to conduct discovery. Defendants United States Department of the Navy and the Secretary of the Navy (collectively "Navy") oppose the motion as does Defendant Manchester Pacific Gateway LLC ("Manchester"). For the reasons set forth below, the court denies the motion to augment the record and denies CCC leave to conduct discovery.

## BACKGROUND

On January 23, 2013, CCC commenced this action by filing a complaint for declaratory and injunctive relief. In broad brush CCC alleges that 15 C.F.R. §930.46 requires Defendants to prepare a supplemental consistency determination. The regulation provides:

>(a) For proposed Federal agency activities that were previously determined by the State agency to be consistent with the management program, but which have not yet begun, Federal agencies shall further coordinate with the State agency and prepare a supplemental consistency determination if the proposed activity will affect any coastal use or resource substantially different than originally described. Substantially different coastal effects are reasonably foreseeable if:
>
>(1) The Federal agency makes substantial changes in the proposed activity that are relevant to management program enforceable policies; or
>
>(2) There are significant new circumstances or information relevant to the proposed activity and the proposed activity's effect on any coastal use or resource.

15 C.F.R. §930.46. CCC alleges that Defendants "have made substantial changes in the proposed activity" for the approved San Diego Navy Broadway Complex project such that a supplemental consistency determination is now mandated by the regulation. (Compl. ¶24). Since the May 1990 approval by the CCC of the consistency determination, CCC now alleges that there have been modifications to the original scope of the Project and that the downtown community has experienced additional development. (Compl. ¶¶15, 16).

Overview[1]

The Navy Broadway Complex ("NBC") site, located on federally owned land in downtown San Diego, presently consists of Navy administrative facilities including the Commander, Navy Region Southwest, and the Fleet Industrial Supply Center San Diego. (Compl. ¶8). In 1982 the Department of the Navy considered options for the consolidation of various Navy installations in the San Diego area. In light of budget constraints, the Department of the Navy pursued a "co-location" program which allowed the federal government to retain title to real property and to lease portions of the property for private revenue-generating uses that could be used to offset the cost of new administrative facilities. Congress enacted legislation in 1986, Public Law

---

[1] A portion of this background section is taken directly from San Diego Navy Broadway Complex Coalition v. U.S. Dept. of Defense, 904 F.Supp.2d 1056, 1058-61 (S. D. Cal. 2012).

99–661, § 2732, 100 Stat 3816 (1986), authorizing the Secretary of the Navy to pursue a public-private venture to implement the co-location concept at the NBC site. The legislation mandated that "any real property leased shall be developed in accordance with detailed plans and terms of development which have been duly formulated by the Navy and the San Diego community through the San Diego Association of Government's Broadway Complex Coordination Group."

Initial Environmental Review Proceedings

To comply with its environmental obligations under NEPA, the Navy completed an Environmental Impact Statement ("EIS") in 1990 and issued a Record of Decision ("ROD") in July 1991. After review and consideration of potential adverse environmental impacts to the project, the City of San Diego ("City") completed an Environmental Impact Report in 1991. A mitigation monitoring program ("MMP") was prepared as part of the environmental review. The City and the Navy agreed that all required environmental processing had been completed and that no further environmental review would be required. In October 1991 the CCC issued a consistency determination, agreeing that the development of the NBC was consistent to the maximum extent practicable with the state's coastal zone management plans. (Compl. ¶13).

Subsequent Environmental Review Proceedings

By 2004 the real estate market in San Diego improved, and the Navy took steps to implement the Development Agreement ("DA") with the City. To facilitate implementation of the DA, the Navy prepared an Environmental Assessment ("EA") analyzing the environmental impacts associated with implementing the 1991 ROD and the 1992 DA. After additional submissions to appropriate agencies, in June 2006, the Navy determined in its EA and issued a Finding of No Significant Impact ("FONSI"). After the Navy determined the viability of the project's Coastal Zone Management Act ("CZMA") approvals, the Navy entered into a ground lease with Manchester.

On January 7, 2009, the San Diego Navy Broadway Complex Coalition

1  ("Coalition") commenced an action against Defendants herein by alleging, among
2  other things, that the Navy failed to provide adequate public notice before making the
3  FONSI. The court granted in part Coalition's motion for summary judgment and, in
4  response to that order, the Navy held additional public hearings and received numerous
5  comments. See <u>San Diego Broadway Complex Coalition v. U.S. Dept. of Defense</u>,
6  07cv0038 JM(WMC). The Navy considered the comments and ultimately discussed
7  potential and actual environmental consequences in greater detail.

8  Upon completion of the mandated additional public comment period, Coalition
9  again commenced an action challenging the EA and FONSI. On October 17, 2012, the
10 court denied Coalition's motion for summary judgment and granted summary judgment
11 in favor of Defendants on all claims. (Ct. Dkt. 11cv0154 JM, No. 76).

12 <u>The Present Motion</u>
13 In preparation for CCC's challenge to the Navy's FONSI determination, CCC
14 moves to supplement the record to include the ground lease entered into between the
15 Navy and Manchester. CCC also seeks leave to conduct discovery. At the time of oral
16 argument, the court requested that an unredacted copy of the ground lease be submitted
17 under seal to facilitate review.

18 **DISCUSSION**
19 **Legal Standards**
20 <u>The Administrative Procedures Act ("APA")</u>
21 The parties agree that the APA provides the legal framework in which to review
22 CCC's merits-based challenges. The APA provides that any agency action that is
23 "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law"
24 is prohibited and shall be overturned by the court. 5 U.S.C. § 706(2)(A); <u>California v.</u>
25 <u>Norton</u>, 311 F.3d 1162, 1170 (9th Cir.2002).
26 <u>Augmentation of the Administrative Record</u>
27 An APA review requires the court to consider the entirety of the administrative
28 record. <u>Citizens to Preserve Overton Park, Inc. v. Volpe</u>, 401 U.S. 402, 420 (1971; 5

U.S.C. §706.  More specifically, "'[T]he 'whole' administrative record, therefore, consists of all documents and materials directly or indirectly considered by agency decision-makers and includes evidence contrary to the agency's position.'" Thompson v. U.S. Dept. of Labor, 885 F.2d 551, 555 (9th Cir. 1989) (quoting Exxon Corp. v. Department of Energy, 91 F.R.D. 26, 32 (N.D. Tex.1981)).

The designation of the administrative record by the Navy is, like any established administrative procedure, entitled "to a presumption of administrative regularity." Bar MK Raches v. Yuetter, 994 F.2d 735, 740 (10th Cir. 1993); Kern County Farm Bureau v. Allen, 450 F.3d 1072, 1076 (9th Cir. 2006) (APA review presumes the agency action to be valid).  To overcome this presumption, the opponent bears the burden to show that augmentation of the record is justified.  The Ninth Circuit has identified four situations where augmentation of the record may be justified:

> (1) if admission is necessary to determine whether the agency has considered all relevant factors and has explained its decision; (2) if the agency has relied on documents not in the record; (3) when supplementing the record is necessary to explain technical terms or complex subject matter; or (4) where there has been a strong showing of bad faith or improper behavior on the part of agency decision makers.

Lands Council v. Powell, 395 F.3d 1019, 1030 (9th Cir.2005) (internal quotations omitted).  These exceptions are applied narrowly. Id.  "To overcome the strong presumption of regularity to which an agency is entitled, a plaintiff must put forth concrete evidence that the documents it seeks to 'add' to the record were actually before the decisionmakers." Marcum v. Salazar, 751 F.Supp.2d 74, 78 (D. D.C. 2010).  As noted by the Supreme Court, a reviewing court should go beyond the agency's record only in exceptional circumstances. Florida Power & Light Co. v. Lorion, 470 U.S. 729, 743-44 (1985).

**The Motion**

<u>Augmentation of the Record</u>

CCC moves to augment the record by the submission of a complete unredacted copy of the lease between the Navy and Manchester.  The administrative record does include a redacted version of the lease.  CCC contends that the Navy has refused to

provide an unredacted copy of the lease on the ground that the Navy "did not directly or indirectly consider the lease in its decision not to prepare a supplemental consistency determination." (Motion at p.8:17-18).

In order to provide a more precise description of the redacted portions of the lease, the court notes that, on May 21, 2007, the Coalition commenced a Freedom of Information Act ("FOIA") action against the Navy for a complete and unredacted copy of the Navy-Manchester lease. San Diego Broadway Complex Coalition v. U.S. Dept. of Navy, 07cv00909 W(POR). Judge Whelan determined that all of the redactions, except section 6.4 discussed below, were exempt from disclosure under Exemption 4 of FOIA as that information contained certain trade secret and commercial or confidential information. (Ct. Dkt. 07cv0909, No. 41).

CCC contends that the Navy's representation that it did not directly or indirectly rely on the lease is either a factual misstatement or made in bad faith. Neither argument is sufficient to overcome the presumption of administrative regularity.

CCC contends that the Navy directly or indirectly considered the lease because section 6.3 of the lease refers to the consistency determination. That section provides:

> 6.3 CCC. The Parties hereby acknowledge Government's position is that (a) the California Coastal Commission (the "CCC") has no jurisdiction or legal authority to issue a Coastal Development Permit for any development of the Premises and that development may proceed so long as the Premises is developed without Deviation (as defined below) from Consistency Determination No. CD 47-90 dated August 21, 1990 ("Deviation" means a substantial change in the project per 15 CFR Sec. 930.46) and (b) Government further finds that there are no significant new circumstances or information relevant to the effect of the development on any coastal resource since the CCC concurred in CD-47-90. Notwithstanding the foregoing the Parties recognize that it may be in the best interests of Lessee to seek and obtain a formal finding by the CCC, without conditions of any kind (including without limitation condo hotel restrictions), that the CCDC Submittal is consistent with the Adopted Findings on Consistency Determination of the CCC dated October 9, 1991 and that no further CCC action will be required for Lessee's Proposed Development and Uses (the "CCC Finding")."

(Exh. C at 005317). Plaintiff contends that the mention of the Navy's position that the CCC has no authority to require a further Coastal Development Permit in connection with 15 C.F.R. §930.46(a) (requiring a supplemental determination whenever there "are

significant new circumstances or information relevant to the proposed activity and the proposed activity's effect on any coastal use or resource") necessarily means "that the lease was 'directly or indirectly considered' by the Navy in its decision not to require a supplemental determination." (Motion at p.9:13-14).

This argument fails on many levels. First, CCC repeatedly asserts that the lease must be made part of the record. Despite CCC's protestations, the court notes that the lease is already a part of the administrative record and those redacted portions are properly excluded pursuant to Exemption 4 of FOIA. CCC sets forth no suggestion that the redactions were improperly exempt from disclosure or otherwise wrongfully redacted. Second, the Navy determined in June 2006 that there were no significant new circumstances requiring a supplemental consistency review. (AR CCB-0025772). Thus, execution of the lease in November 2006 came after the Navy's determination that no supplemental review was required, not before that determination. Further, the recitation of the Navy's position in the lease - followed by a statement that "it may be in the best interests of Lessee to seek and obtain a formal finding by the CCC" does not establish bad faith or that the lease was considered prior to the Navy's consistency determination. There is simply nothing in the record to suggest that the lease was either directly or indirectly considered by the Navy in making its consistency determination in June 2006. CCC fails to identify reasonable non-speculative grounds for its belief that the lease was considered by the Navy, either directly or indirectly, at the time of the consistency determination. See Pac. Shores Subdivision Cal. Water Dist. v. U.S. Army Corps of Eng'rs, 448 F.Supp.2d 1, 6 (D. D.C. 2006).

CCC also argues that section 6.4 of the lease (the section that Judge Whelan found was not exempt from disclosure) supports augmenting the record. That section provides:

> "6.4 Good Faith Efforts. Lessee shall use reasonable good faith efforts to obtain the CCDC Determination and the CCC Finding. Government shall use reasonable good faith efforts to cooperate with Lessee's obtaining the CCDC Determination and the CCC Finding."

This section, read in conjunction with section 6.3, means, according to CCC, that the

Navy (1) believed that Manchester's proposal was consistent with CZMA then, and in the future, despite any modifications to the project's scope; and (2) had a contractual duty to contend that the project needed no additional consistency determination even if it believed otherwise. These strained arguments simply fail to establish bad faith on the part of the Navy or to undermine the Navy's representation that the lease was neither directly or indirectly considered in its consistency determination. Mere speculation and innuendo fail to rebut the administrative regularity of the Navy's determinations.

Further, CCC argues that an "unredacted version should be provided in order to ensure that none of the redacted sections are relevant to this lawsuit." (Motion at p.9:22-23). While this argument is neither tethered to any legal authority or evidence, at the time of oral argument the court requested the submission under seal of an unredacted copy of the lease. Upon review of the redacted portions of the lease, the court concludes that the redacted portions of the lease, like the lease itself, are not properly included in the record because the lease was not considered, either directly or indirectly, at the time of the Navy's consistency determination. Furthermore, the redacted portions of the lease do not establish a factual misstatement in the record or bad faith on the part of the Navy.

Finally, the court rejects CCC's assertion that, in addition to section 6.4 (the provision ordered to be disclosed in Judge Whelan's FOIA order), "the Navy is likely withholding other sections and information which it directly or indirectly considered in deciding not to prepare a supplemental determination." (Motion at p.10:7-9). CCC fails to support this speculative statement with any evidence or citation to the record. The court notes that mere suspicion and hollow, over-reaching arguments do not advance the Coastal Act's lofty goals to "(a) Protect, maintain, and, where feasible, enhance and restore the overall quality of the coastal zone environment and its natural and manmade resources. (b) Assure orderly, balanced utilization and conservation of coastal zone resources taking into account the social and economic needs of the people

1 of the state." Cal. Pub. Res. Code §30000(a) and (b).

2 In sum, the court denies CCC's motion to augment the record by including an unredacted copy of the lease in the administrative record.

<u>The Motion for Discovery</u>

CCC seeks to broadly propound written discovery on the Navy and Manchester regarding (1) the lease, or any of its provisions (presumably including attorney communications, negotiations, drafts, and other analyses) and (2) the Navy's consistency determination (including emails, internal communications, analyses, and drafts). CCC also desires to take the depositions of the individuals most knowledgeable about the lease provisions, lease negotiations, and the decision not to prepare a supplemental consistency determination. CCC also seeks to take the depositions of individuals who made the consistency determination to determine if the individuals "were influenced by any provisions in the lease, the negotiations of the lease, the lease generally, and communications with Manchester." (Motion at p.23:20-22).

The court denies the motion for discovery for two primary reasons. First, as noted by CCC, discovery is permitted "where plaintiffs make a showing of bad faith by the agency. See <u>Animal Def. Council v. Hodel</u>, 840 F.2d 1432, 1437-38 (9th Cir. 1988)." (Motion at p. 12:2-4). Here, there is simply no showing of bad faith or wrongful conduct on the part of the Navy. CCC argues that the timing of events occurring about six months after the decision that no supplemental consistency determination was required, "bear on" the Navy's bad faith. CCC cites several reports, authored in late 2006 or early 2007, with titles such as "Intermediate Recommendation - That Project Modifications And Development Patterns in Downtown San Diego 1991 Might Require a Supplemental Consistency Determination." (AR 0030180 - 00300203). CCC notes that these documents were dated both before and after the Navy entered into the lease agreement on November 22, 2006. CCC describes these documents by using the word "curiously" to describe this event. Rather than attribute

1  a "bad" motive to the documents, the documents may be seen as acknowledging the
2  common sense and unremarkable proposition that urban development has occurred in
3  San Diego from 1991 to the present and that the scope of the project is not identical to
4  that envisioned in 1991. The issue before the Navy, and bearing on this court's
5  ultimate analysis, is the degree of development: whether "the proposed activity will
6  affect any coastal use or resource substantially different than originally described." 15
7  C.F.R. §930.46(a).

8      CCC also contends that there are substantial gaps in the record: (1) there are
9  virtually no communications in the record between the Navy and Manchester (the
10 Government responds that, to the extent the communications were considered, those
11 communications are in the record); (2) there are no internal emails, memos, analyses,
12 and drafts of comments about the supplemental determination issue from late
13 November 2006 to mid-February 2007; and (3) there are no internal emails, memos,
14 analyses, and drafts of comments about the supplemental determination issue from late
15 October 2011 to January 2012. When asked about apparent and alleged gaps in the
16 record, the Navy purportedly responded that "it included all the documents in the
17 record that it considered." (Motion at p.18:7-8). The court gives little weight to the
18 arguments raised by CCC. While CCC attempts to draw a negative inference from the
19 timing of the alleged gaps in the record, the court notes that the Navy's decision
20 regarding a supplemental consistency determination was made in June 2006, about five
21 months before the alleged gaps in the record. Accordingly, the court does not draw a
22 negative inference from the timing of the alleged gaps in the record.[2]

23     Second, the court cannot condone the use of discovery to engage in "fishing
24 expeditions." <u>Rivera v. NIBCO, Inc.</u>, 363 F.3d 1057, 1072 (9th Cir. 2004). CCC must
25 articulate a reasoned basis for discovery supportive of its claim of alleged bad faith or

---

[2] CCC also challenges the adequacy of the privilege logs prepared by the Navy. The Navy represents in its opposition that all issues regarding the privilege logs have been resolved. The court declines to reach any privilege log issue and, to the extent there is an outstanding privilege log issue, directs the parties to raise the issue before the Magistrate Judge assigned to this case.

wrongdoing.  Mere speculation is an inadequate ground to compel discovery in an administrative review action.  In light of CCC's mere suspicions and innuendo of wrongdoing on the part of the Navy, the court concludes that CCC fails to make a threshold showing that discovery is warranted under the circumstances.

In its reply brief, CCC repeatedly states that the lease and CCC's Staff Report must be part of the record because, among other things, in the Navy's October 17, 2011 letter to CCC, it referred to the lease.  The Navy represents that it will make the CCC Staff Report a part of the record even though it "has nothing to do with the project at issue in this case" and does not directly or indirectly relate to the Navy's decision not to conduct a supplemental consistency review.  (Navy Oppo. at p.21:2-8).  Accordingly, there is no issue with respect to the Staff Report.

Finally, CCC argues that section 6.3 of the lease provides further support that the lease must be included as part of the record.  That section provides, in relevant part, "the Government further **finds** that there are no significant new circumstances or information relevant to the effect of the development on any coastal resource." (Emphasis added).  Because the provision uses the present-tense "finds" as opposed to the past-tense "found," CCC construes this language to mean that "the Navy made the finding (that no supplemental consistency determination was required) in the lease itself." (Reply at p.3:18-19).  Without explaining how, CCC concludes that judicial review will be thwarted unless the lease is made a part of the record.  The court rejects this argument as CCC fails to shed any light on how the tense of the chosen verb bears on the redactions contained in the lease.

In sum, the court denies CCC's motion to augment the record and to conduct discovery.

**IT IS SO ORDERED.**

DATED:  January 6, 2014

_____
Hon. Jeffrey T. Miller
United States District Judge

cc:         All parties