1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CALIFORNIA COASTAL COMMISSION<br><br>         Plaintiff,<br><br>  vs.<br><br>UNITED STATES DEPARTMENT OF THE NAVY; SECRETARY OF THE NAVY, RAY MABUS, in his official capacity; and MANCHESTER PACIFIC GATEWAY LLC,<br><br>         Defendants. | CASE NO. 13cv0178 JM(JLB)<br><br>ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT; DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT |

Plaintiff California Coastal Commission ("CCC") moves for summary judgment on its claim that the Federal Defendants' decision not to conduct a supplemental consistency determination under the Coastal Zone Management Act ("CZMA"), 16 U.S.C. §1451 et seq., is arbitrary and capricious under the Administrative Procedure Act ("APA"), 5 U.S.C. §701 - 706.  The United States Department of the Navy ("Navy") and Secretary of the Navy Ray Mabus, in his official capacity, (collectively "Federal Defendants") oppose the motion as does Defendant Manchester Pacific Gateway LLC ("Manchester").  All Defendants separately move for summary judgment. Having carefully considered the Administrative Record, pertinent legal authorities, the arguments of counsel and for the reasons below, the court denies CCC's motion for

summary judgment on all claims and grants Defendants' motion for summary judgment on all claims. The Clerk of Court is instructed to enter judgment appropriately and to close the file.

## A. BACKGROUND

On January 23, 2013, the CCC commenced this action against Defendants to enjoin them from proceeding with the redevelopment of the Navy Broadway Complex ("NBC") until the Navy prepares a supplemental consistency determination ("CD") as allegedly required by the Coastal Zone Management Act ("CZMA"), 15 C.F.R. §930.1 et seq. (Ct. Dkt. 1, ¶1). As more fully described below, the present action is one of five actions concerning the redevelopment of the NBC.

The following facts are taken from the Administrative Record ("AR").

## I. Overview

The NBC site, located on federally-owned land in downtown San Diego, presently consists of Navy administrative facilities including the Commander, Navy Region Southwest, and the Fleet Industrial Supply Center San Diego. (AR 4772, 55664). The present Navy facilities, constructed primarily between 1921 and 1944, consist of about 400,000 SF of administrative office space and 500,000 SF of warehouse space. (AR 2431). The remainder of the site consists of asphalt parking lots, and the entire site is fenced and public access restricted. (AR 55682).

In 1982 the Navy considered options for the consolidation of various Navy installations in the San Diego area. In light of budget constraints, the Navy pursued a "co-location" program which allowed the federal government to retain title to real property and to lease portions of the property for private revenue-generating uses that could be used to offset the cost of new administrative facilities. Congress enacted legislation in 1986, Public Law 99-661, § 2732, 100 Stat 3816 (1986), authorizing the Secretary of the Navy to pursue a public-private venture to implement the co-location concept at the NBC site. The legislation mandated that "any real property leased shall be developed in accordance with detailed plans and terms of development which have

been duly formulated by the Navy and the San Diego community through the San Diego Association of Government's Broadway Complex Coordination Group."  (AR 956).

To obtain the objective of updated Navy administrative facilities, an advisory group, the Broadway Complex Coordinating Group ("BCCG"), formed in 1985 under the auspices of the San Diego Association of Governments ("SANDAG") to serve as community advisors for the planning of the NBC site and to initiate consultation with local governmental authorities.  In June 1987, the Navy and the City of San Diego executed a Memorandum of Understanding ("MOU") to establish the terms of potential future development on the NBC site. (AR 1100).  On September 22, 1989, the BCCG adopted the design principles for the NBC site and established detailed plans and development terms required by the legislation.

**II.  Initial Environmental Review Proceedings**

To comply with its environmental obligations under the National Environmental Policy Act ("NEPA"), the Navy completed an Environmental Impact Statement ("EIS") in 1990 and issued a Record of Decision ("ROD") in July 1991.  (AR 25795-96).  The ROD memorialized the Navy's decision to redevelop the NBC site and identified essential uses for the site.  The ROD also identified that the next step in the process was for the Navy and the City to enter into a Development Agreement ("DA"), as contemplated under the 1987 MOU.  Among other things, the MOU provided that the Navy, in consultation with the City, would prepare a development plan and urban design guidelines (i.e. land uses, density, viewscapes, building heights, open space, etc.).

In August 1990, the Navy released a Coastal Consistency Determination for the project pursuant to the CZMA.  (AR 2424-91).  The CZMA directs that each federal agency must consider activities affecting the coastal zone "to the maximum extent practicable, consistent with approved state management programs."  16 U.S.C. §1451 et seq.  Following this mandate, the 1990 CD concluded - with the consultation and approval of the CCC - that the NBC project was, to the maximum extent practicable,

consistent with the California Coastal Act ("CCA"). Cal. Public Resources Code Section 30000 et seq. (AR 2427). The CCA, Chapter 3, articulates the state's coastal resources planning and management policies. The NBC project was evaluated and found to be fully consistent with the CCA.

In its determination, the Navy analyzed the impacts of the NBC project on coastal resources and uses in the surrounding coastal zone to ensure that the NBC project was consistent to the maximum extent practicable with the coastal policies of the CCA. (AR 2422, 2427). As a part of the CD, the Navy described the preferred development for the NBC and adopted the Urban Design Guidelines ("Guidelines") and the DA. (AR 2481-91). The DA identified a four-block development scheme with commercial offices, Navy offices, hotel, retail, public attractions and parking uses. The proposed action called for the development of up to 3.25 million SF with approximately 1 million SF of Navy administrative space. (AR 2438). Among other things, the Guidelines also specified building setbacks, sidewalk depths, architectural designs, and the existence of a 1.90 acre open space at the foot of Broadway. (AR 2481-85).

After review and consideration of potential adverse environmental impacts, the City completed an Environmental Impact Report in 1991. A mitigation monitoring program ("MMP") was prepared as part of the environmental review. The City and the Navy agreed that all required environmental processing had been completed and that no further environmental review would be required. In October 1991, the CCC adopted the findings of the Navy, agreeing that the development of the NBC was consistent to the maximum extent practicable with the state's coastal zone management plans and issued the CD. (AR 3723). The CCC noted that "no further Commission action is required for the redevelopment to proceed as presented in the consistency determination," but any "proposed deviation from the plan and guidelines will require the Navy to submit a new coastal consistency determination or its developer to obtain a coastal development permit." (AR 3746).

Following further public review, on November 2, 1992, the City enacted an

ordinance approving the DA for the NBC site.  The DA incorporated, among other documents, the MMP and provided a guide for the planning and approval process for the project.  The original DA provided for the termination of the DA by January 1, 2002, unless a Developer Lessee was selected and recorded.  Following public hearings, the original deadline was extended first to January 1, 2003 and later to January 1, 2007. (AR 4830).

## III.  Subsequent Environmental Review Proceedings

Due to adverse conditions in the San Diego real estate market, implementation of the DA did not commence immediately.  By 2004, the real estate market in San Diego improved; and the Navy took steps to implement the DA.  Further, in 2005, the Base Realignment and Closure Commission ("BRAC") issued a directive to the Secretary of the Navy to either implement the DA or close the NBC and relocate the units and functions of the NBC to other Navy-owned sites in San Diego.  (AR 30908).

To facilitate implementation of the DA, in 2006, the Navy prepared an Environmental Assessment ("EA") analyzing the environmental impacts associated with implementing the 1991 ROD and the 1992 DA.  Among other things, the EA examined the environmental impacts of implementing the DA in then-current 2006 conditions.  (AR 25772).  Concurrently with the preparation of the EA, the Navy, on March 31, 2006, selected Manchester to participate in exclusive negotiations for the NBC project.  (AR 26615-16).  On November 22, 2006, the Navy signed a lease with Manchester for the redevelopment of the NBC in accord with the DA.  With the selection of Manchester, work commenced on the design phase submissions to Centre City Development Corporation ("CCDC") for a consistency review and determination of conformity with the DA.

Each design stage of the project had to be approved by CCDC for conformity to the standards and initial consistency determination.   Beginning in April 2006, the CCDC held five public workshops to display the plan proposed by the developer. CCDC also conducted public meetings wherein the NBC proposals were considered.

1    At these meetings, the public provided comments to CCDC.  Such comments were

2  provided to the Navy for consideration in its NEPA process.

3          Pursuant to NEPA, on November 22, 2006, the Navy issued a Finding of No

4  Significant Impact ("FONSI").  In summarizing the environmental effects of the NBC,

5  the FONSI concluded:

6          The EA demonstrated that implementation of the proposed action, which
        includes measures to reduce or avoid impacts to the environment as
7        defined in the Development Agreement, will not have a significant effect
        on the human environment, and therefore an EIS is not required.  The EA
8        revealed that with measures in place to reduce project impacts, and
        associated development-related best management practices, that there
9        would be no significant impacts to environmental quality.

10  (AR 31101).  Shortly thereafter, the lease with Manchester was executed.  (AR 41786).

11  **IV.  CCC's Requests for a Supplemental Consistency Determination**

12          Shortly before the issuance of the FONSI and execution of the ground lease with

13  Manchester, on October 25, 2006, CCC informed the Navy of its belief that the NBC

14  project underwent project modifications between 1991 and October 2006 and that new

15  development patterns and uses had occurred in downtown San Diego since 1991.  (AR

16  30181).  The CCC articulated three reasons for its view that a supplemental CD was

17  required:

18          (1) changes in development patterns and intensification of uses and traffic
        in the downtown shoreline area have occurred since 1991 which may
19        adversely affect the scenic amenities of the waterfront and coastal access
        opportunities; (2) a significant change to the project consisting of
20        replacing traditional hotel(s) with condominium ownership hotel(s); and
        (3) modifications to the physical development as shown on the attachment.
21
22  (AR 30181).[1]

        In February 2007, the Navy responded to the CCC letter seeking to clarify
23
24  perceived misconceptions about the project.  (AR 32503-06).  The Navy respectfully

25  disagreed with the three reasons articulated by the CCC.  First, the Navy noted that the

26  NBC project complied with the patterns and intensification of uses and traffic in the

27  ───────────────

28        [1] The court notes that the CCC does not argue in its motion for summary judgment that the
change in ownership form of the hotel affects any coastal use or resource substantially different than
originally contemplated.

downtown shoreline area that have occurred since 1991.  The letter also noted that the growth in the area "has had the effect of increasing the scale and bulk of the existing visual character of the waterfront area, making the Broadway project more consistent with the visual policies of the" CCA noting, for instance, that the adjacent Hyatt Regency hotel is over 440 feet tall, almost twice the height of any of the planned NBC buildings.  (AR 32503-04).  With respect to parking, the Navy's letter noted that the number of trips associated with the project would be 30% less than what was originally assumed because of a reduction in density (less office space).  While acknowledging that certain traffic impacts are significant and unmitigable (this is the same situation as existed in 1990), the Navy noted that the most impacted areas were to intersections and interstate ramps outside the coastal zone and that the majority of waterfront travel would occur on the weekends, which would not be impacted by weekday peak-hour traffic related to the project.  With respect to parking, the Navy explained that more parking would be provided than that anticipated in the January 2006 Centre City Draft Planning Development Overlay and that the opening of roads that were currently closed would create increased traffic flow and public parking access to the waterfront.  (AR 332504).

With respect to the different ownership structure of the hotel(s), the Navy noted that construction and operation of condominium ownership would not result in a use significantly different from the construction and operation of traditional hotels. Whether a condominium or traditional ownership of hotels, the Navy noted that the use will "substantially improve recreational uses and opportunities on the waterfront over existing conditions." Id.

Finally, the Navy explained that the modifications identified in the CCC's attachment were "unfounded" because the attachment compared the developer's March 2006 submittal to the developer's June 2006 submittal to the CCDC.  (AR 32505).  The Navy explained that the attachment did not reflect either the plan approved by the CCC or the current plan.  Further, the Navy explained that the current plan did not propose

any substantial changes to the project as proposed in the 1990 CD and that "the minor changes that have been made to the project will not result in substantially different effects to coastal uses or resources." (AR 32506).

On August 25, 2011, the CCC again notified the Navy that it intended to reconsider its prior CD on essentially the same grounds identified in its October 2006 letter and that the matter would be placed on the CCC's November public meeting agenda. (AR 52166). In response, the Navy requested that the public meeting be postponed pending the Navy's litigation in San Diego Navy Broadway Complex Coal. v. U.S. Dep't of Def., No. 3:11-cv-0154 JM ("Navy Broadway II"). The Navy explained that significant overlap existed between the issues in Navy Broadway II and the CCC letter. The letter further explained that the Navy could not comment on pending litigation. On September 26, 2011, the CCC denied the Navy's request for a postponement. On October 17, 2011, the Navy sent another letter to CCC requesting a postponement of the meeting. The letter also explained its reasons in support of its position that no supplemental CD was required.

In late October 2011, the CCC issued a lengthy staff report prior to its November meeting concerning the NBC. (AR 52301-40). On October 31, 2011, the Navy responded again by letter to inform the CCC of its position and the reasons for its position that no supplemental CD was required for the project because there had been no substantial changes to the activity relevant to management program policies and there were no significant new circumstances or information relevant to the activity and the activity's effect on any coastal use or resource. (AR 52287-300).

Following the public meeting, the CCC reiterated its belief that a supplemental CD was required and indicated that the CCC would hold a hearing on December 9, 2011, to formally adopt the findings. (AR 52403-42). On December 8, 2011, the Navy once again, by letter to the CCC, incorporated its earlier analysis for its position that a supplemental CD was not required for the NBC. (AR 52483).

On December 12, 2011, the CCC informed the Navy that it had adopted the

proposed findings that the NBC project was no longer consistent to the maximum extent practicable with the CCA. (AR 52527-28). The Navy, by letter dated January 12, 2012, voiced its opposition to the CCC's findings and again reiterated its position. (AR 52574-75). One year later, on January 23, 2013, the CCC commenced the present action.

## V. Prior Litigation Concerning the NBC Project

### 1. Navy Broadway I

On January 4, 2007, the San Diego Navy Broadway Complex Coalition ("NBCC"), a non-profit social-advocacy organization, commenced an action against the Federal Defendants and Manchester pursuant to NEPA and the APA, alleging that the Navy failed to (1) provide adequate notice, public participation, and comment prior to issuance of the EA and FONSI, (2) consider a reasonable range of alternatives, and (3) prepare a supplemental EIS ("SEIS"). See San Diego Navy Broadway Complex Coal. v. U.S. Dep't of Def., 3:07-cv-0038 JM(WMC) ("Navy Broadway I"). On June 26, 2008, this court ruled in favor of the NBCC on the public participation claim and declined to reach the other NEPA issues.

In response to the court's order, the Navy produced a new draft EA examining the environmental impacts of implementing the DA in then-current 2008 conditions, made the draft EA available for public review and comments for 45 days and held three public meetings. (AR 56655-67). Upon completion of the EA, the Navy concluded that a supplemental CD was not warranted and, in March 2009, the Navy issued the 2009 EA. The parties to Navy Broadway I then filed a joint motion to dismiss the action and, on August 13, 2009, the court dismissed the action without prejudice.

### 2. Manchester v. CCC

On June 15, 2007, Manchester commenced an action against the CCC seeking a declaration that the NBC is federally owned land, the use of which is subject to federal discretion and therefore excluded from the definition of "coastal zone" under the CZMA. See Manchester Pac. Gateway v. CCC, No. 3:07-cv-1099 JM ("Manchester v.

CCC"). On the limited arguments raised by the parties, on April 25, 2008, the court granted partial summary judgment in favor Manchester and against the CCC. (Id. Ct. Dkt. 49). On August 5, 2008, the court granted the parties' joint motion to dismiss the remainder of Manchester's claims and, following entry of judgment, CCC appealed the partial grant of summary judgment. On or about November 16, 2011, the CCC voluntarily dismissed the appeal. (Id. Ct. Dkt. 76).

### 3. Navy Broadway II

Upon completion of the 2009 EA, on January 25, 2011, the NBCC commenced a new action against the Federal Defendants pursuant to NEPA and the APA, alleging that the Navy failed to comply with NEPA by (1) failing to consider a reasonable range of alternatives, (2) failing to prepare an EIS, and (3) failing to prepare a SEIS. See Navy Broadway II, No. 3:11-cv-0154 JM. On October 17, 2012, the court granted the defendants' motion for summary judgment and denied the NBCC's motion for summary judgment, noting that "Defendants' consideration of the identified alternatives is neither arbitrary,"capricious nor a violation NEPA and an EIS and "a SEIS [are] not required under NEPA because Defendants' decision was based on consideration of relevant factors and the actions were not arbitrary, capricious, nor a violation of law." (Id. Ct. Dkt. 76). On December 10, 2012, the NBCC appealed the order. The appeal is pending before the Ninth Circuit.

### 4. The State Litigation: NBCC v. City of San Diego

As set forth above, in 2006 and 2007, Manchester submitted its construction plans to the CCDC. In connection with its consistency review, the CCDC determined that no further environmental review of the project was warranted under the California Environmental Quality Act ("CEQA"), Cal. Pub. Resources Code, §21000 et seq. The NBCC appealed the CCDC's decision to the San Diego city council. The city counsel denied the appeal, finding that there was no significant new information showing any new or significantly different project impacts than those analyzed and mitigated in the EIR/EIS. On May 11, 2009, Superior Court Judge Ronald S. Prager granted judgment

in favor of Manchester and the City, finding that there were no substantial changes or circumstances requiring supplemental or subsequent review.  See <u>San Diego Navy Broadway Complex Coal. v. City of San Diego</u>, 2009 WL 9511449 (Cal. Sup. Ct. Apr. 27, 2009) ("<u>NBCC v. City of San Diego</u>").  The Court of Appeal for the Fourth District of California affirmed the CEQA judgment.  See <u>San Diego Navy Broadway Complex Coal. v. City of San Diego</u>, 185 Cal. App. 4th 924 (June 13, 2010).

## VI.  Time Line of Key Events

| | |
|---|---|
| November 14, 1986 | Enactment of co-location program, P.L. 99-661, §3816 (1986) |
| October 1990 | Final Environmental Impact Statement |
| July 1991 | Record of Decision |
| November 2, 1992 | Enactment of ordinance by City Council approving Development Agreement |
| June 2006 | 2006 Environmental Assessment |
| October 25, 2006 | First request by CCC for a supplemental CD |
| November 22, 2006 | Issuance of FONSI |
| November 2006 | Execution of lease by Manchester and the Navy |
| June 26, 2008 | Remand in <u>Navy Broadway I</u> on public participation claim |
| March 2009 | In response to remand in <u>Navy Broadway I</u>, issuance of 2009 Environmental Assessment |
| June 17, 2010 | Cal. Court of Appeals rejects CEQA challenge in <u>NBCC v. City of San Diego</u> |
| November 16, 2011 | CCC dismisses appeal in <u>Manchester v. CCC</u> |
| December 8, 2011 | Following additional requests by the CCC, the Navy provides written reasons why supplemental CD not required for the NBC |
| December 12, 2011 | CCC formally adopts findings that supplemental CD required for the NBC |
| October 17, 2012 | Court grants summary judgment in favor of Federal Defendants in <u>Navy Broadway II</u> on NBCC's claim that EIS or a supplemental EIS is required for the NBC (appeal pending before the Ninth Circuit) |

## B.  DISCUSSION

13cv0178

## I. Legal Standards

### 1. Summary judgment

Summary judgment is proper if there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). In cases brought under the APA for review of an agency's decision, "the function of the district court is to determine whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did." See Occidental Eng'g Co. v. INS, 753 F.2d 766, 769-70 (9th Cir. 1985). "Because this is a record review case, we may direct that summary judgment be granted to either party based upon our review of the administrative record." Karuk Tribe of Cal. v. U.S. Forest Serv., 681 F.3d 1006, 1017 (9th Cir. 2012).

### 2. Standard of Review

In general, judicial review of actions under CZMA is governed by the Administrative Procedure Act ("APA"), 5 U.S.C. §§551-559, 701-706. Akiak Native Cmty. v. U.S. Postal Serv., 213 F.3d 1140, 1144 (9th Cir. 2000). The APA provides that any agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" is prohibited and shall be overturned by the court. 5 U.S.C. §706(2)(A); California v. Norton, 311 F.3d 1162, 1170 (9th Cir. 2002). Under this standard, the "court is not to substitute its judgment for that of the agency." Motor Vehicle Mfrs. Ass'n of U.S. Inc. v. State Farm Mut. Auto Ins. Co., 463 U.S. 29, 43 (1983). Nevertheless, "the agency must examine the relevant data and articulate a satisfactory explanation" for its decision and, in reviewing that explanation, the court must consider whether the decision was based on the consideration of the relevant factors and whether there was a clear error in judgment. Id. This inquiry must "be searching and careful," but "the ultimate standard of review is a narrow one." Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 416 (1971); Natural Resources Defense Council, Inc. v. Hodel, 819 F.2d 927, 929 (9th Cir. 1987).

The court's review is based on the administrative record. See Fence Creek Cattle

Co. v. U.S. Forest Serv., 602 F.3d 1125, 1131 (9th Cir. 2010). In reviewing agency action, the court "may not substitute its judgment for that of the agency concerning the wisdom or prudence of a proposed action." Laguna Greenbelt, Inc. v. U.S. Dept. of Transp., 42 F.3d 517, 523 (9th Cir. 1994) (quoting Oregon Envtl. Council v. Kunzman, 871 F.2d 484, 492 (9th Cir. 1987)). The court only considers whether the decision was "based on a consideration of the relevant factors and whether there has been a clear error of judgment." Akiak, 213 F.3d at 1146. The inquiry is whether there is a "rational connection between the facts found and the conclusions made." River Runners for Wilderness v. Martin, 593 F.3d 1064, 1070 (9th Cir. 2010) (per curiam). An agency decision is arbitrary and capricious "only if the agency relied on factors Congress did not intend it to consider, entirely failed to consider an important aspect of the problem, or offered an explanation that runs counter to the evidence before the agency or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." Greater Yellowstone Coal. v. Lewis, 628 F.3d 1143, 1148 (9th Cir. 2010).

3. Supplemental Consistency Determination Under the CZMA

The CZMA declares that the national policy is to "preserve, protect, develop, and where possible, to restore or enhance, the resources of the Nation's coastal zone for this and succeeding generations." 16 U.S.C. § 1452(1). The national policy is also to "encourage coordination and cooperation" among federal and state agencies in their "regulation of land use practices affecting" the coast. 16 U.S.C. § 1452(5). In general, the CZMA then requires that "[e]ach Federal agency activity within or outside the coastal zone that affects any land or water use or natural resource of the coastal zone shall be carried out in a manner which is consistent to the maximum extent practicable with the enforceable policies of approved State management programs." 16 U.S.C. § 1456(c)(1)(A).

Once coordination between a federal agency and the state pursuant to the CZMA has been completed, supplementation is only required "if the proposed activity will affect any coastal use or resource substantially different than originally described" in

the coordination process. 15 C.F.R. § 930.46(a). The regulations on the CZMA explain that:

> Substantially different coastal effects are reasonably foreseeable if:
>
> (1) The Federal agency makes substantial changes in the proposed activity that are relevant to management program enforceable policies; or
>
> (2) there are significant new circumstances or information relevant to the proposed activity and the proposed activity's effect on any coastal use or resource.

Id. The National Oceanic and Atmospheric Administration ("NOAA"), the agency charged with administering the CZMA, expressed in the Federal Register that it expected that the CZMA supplemental CD procedures would be "little used." See CZMA Fed. Consistency Regs., 65 Fed. Reg. 77124, 77143 (Dec. 8, 2000).

Finally, the court notes that the only authority concerning a supplemental CD is a case arising from a project to deepen the main channel of the Delaware River by the U.S. Army Corps of Engineers. Del Dep't of Natural Res. & Envtl. Control v. U.S. Army Corps of Eng'rs, 685 F.3d 259, 287 (3d Cir. 2012). There, the states of Delaware and New Jersey provided CZMA consistency determinations to the U.S. Army Corps of Engineers ("Corps") in 1997. In 2002, New Jersey sought to revoke the CD and, in 2008 and 2009 the state requested a supplemental CD. The Corps refused to provide a supplemental CD. However, in November 2009, the Corps issued a Memorandum of Record concluding that "no additional coordination was necessary for the Corps to comply with the CZMA." Id. at 266. In 2009, Delaware issued an order requiring the Corps to obtain a supplemental CD, contending that "substantial project modifications" had rendered its 1997 CD outdated. Both States commenced an action to prevent the Corps from proceeding with the dredging. The States argued that the Corps' refusal to seek a supplemental CD was arbitrary and capricious and that the 2009 EA was seriously flawed. Id. at 286.

The Third Circuit rejected the States' appeal. Even though there were new circumstances and information that had developed since the issuance of the CD, the Corps found in its 2009 EA that none of the changes were substantial within the

meaning of 15 C.F.R. §§ 930.46(a)(1), (2). The district court and the Third Circuit both concluded that the Corps was justified in relying on the 2009 EA to conclude that a supplemental CD was not required and that such determination was neither arbitrary nor capricious.

**II. Laches**

The Navy contends that this action is barred by the doctrine of laches. As explained in <u>Save the Peaks Coalition v. U.S. Forest Service</u>, 669 F.3d 1025 (9th Cir. 2012):

> Laches is an equitable defense that limits the time in which a party may bring suit. It derives from the maxim that a party who sleeps on his rights loses his rights. Whether laches applies depends on the particular facts and circumstances of each case.
>
> To establish laches, a party must demonstrate "(1) that the opposing party lacked diligence in pursuing its claim; and (2) that prejudice resulted from that lack of diligence." Because environmental damage does not inflict harm only on the plaintiff, laches is strongly disfavored in environmental cases. "The use of laches 'should be restricted to avoid defeat of Congress' environmental policy.'"

<u>Id.</u> at 1031 (citations and internal quotations omitted); <u>Cedars-Sinai Med. Ctr. v. Shewry</u>, 41 Cal. Rptr. 3d 48, 64-65 (2006). The doctrine of laches is invoked sparingly in suits brought to vindicate the public interest. <u>Apache Survival Coal. v. United States</u>, 21 F.3d 895, 905 (9th Cir. 1994).

1. <u>Diligence</u>

The Navy argues that the CCC did not act diligently in pursuing this action. In determining diligence, the court considers pertinent factors including "(1) whether the party attempted to communicate its position to the agency before filing suit, (2) the nature of the agency response, and (3) the extent of actions, such as preparatory construction, that tend to motivate citizens to investigate legal bases for challenging an agency action." <u>Save the Peaks</u>, 669 F.3d at 1031. The court also considers the length of delay and the circumstances surrounding that delay. <u>Id.</u>

Here, the CCC requested that the Navy prepare a supplemental CD in October 2006. (AR 30180). In February 2007, the Navy responded with a detailed analysis

explaining its position that a supplemental CD was not required for the project.  (AR 32503-06).  Following remand in Navy Broadway I, in 2008, the CCC again reiterated its position that a supplemental CD was required for the project, and the Navy responded to CCC's claim in the 2009 EA explaining its position that a supplemental CD was not required for the project.  (AR 56655-67).  The CCC again reiterated its position and, on October 17, 2011, the Navy again articulated its consistently held position that a supplemental CD was not required for the project.  (AR 52194-217).  Once the CCC Staff again recommended a supplemental CD for the project on October 21, 2011, the Navy again, by letter dated October 31, 2011, rejected the CCC's request for a supplemental CD.  (AR 52287-300).  Finally, the record demonstrates, through the existence of Broadway I, Broadway II, Manchester v. CCC, NBCC v. City of San Diego, and the 2009 EA, that motivation and notice existed for concerned citizens to challenge the Navy's actions.

Based upon the entirety of the Administrative Record, the court concludes that the CCC has not been diligent in pursuing its claim.  The parties have consistently and clearly taken opposite positions with respect to the supplemental CD since 2006.  Further, the CCC had opportunities to join in Navy Broadway I, filed in 2007, or Navy Broadway II, filed in 2011, but declined to do so.  In Save the Peaks, the United States Forest Service ("USFS") considered public comments in 2004 and prepared a final EIS permitting making snow from recycled water.  In June 2005, another group of plaintiffs, the Navajo plaintiffs, filed suit against the USFS to stop the use of reclaimed water to produce artificial snow.  The district court rejected the Navajo plaintiffs' NEPA and other federal statutory challenges.  The United States Supreme Court denied certiorari on June 8, 2009.  Shortly thereafter, on September 21, 2009, Save the Peaks commenced an action alleging that the USFS violated NEPA.  The district court, affirmed by the Ninth Circuit, concluded that the doctrine of laches prevented Save the Peaks from pursuing the action.

The Ninth Circuit found Save the Peaks' conduct "egregious" in waiting four

years to pursue the NEPA claim and waiting until after the conclusion of the Navajo action to bring its own action.  The Ninth Circuit noted that it does not "encourage successive challenges, where one plaintiff awaits the outcome of another plaintiff's case before bringing its own claim."  Id. at 1031.

The desultory pace of lurching litigation caused primarily by the seeming failure of the CCC and NBCC to coordinate efforts and consolidate challenges to the NBC project has been a detriment for all interested parties.  Moreover, the public's reasonable expectation for closure, one way or the other, for a project of this scale, has been effectively thwarted by the unfortunate timing of these single-track challenges.

In sum, the circumstances surrounding the CCC's six-year delay in bringing this action fail to demonstrate that the CCC acted diligently in pursuing its CZMA claim. Whether prejudice exists, within the meaning of relevant law, must now be addressed.

2.  Prejudice

The Ninth Circuit defines prejudice in environmental cases in the following manner:

> "Prejudice in environmental actions is measured by 'what Congress defines as prejudice. The primary concern is whether the harm that Congress sought to prevent ... is now irreversible.'"  Accordingly, two relevant factors are "the money spent on a project and the extent to which a project has progressed so far that 'the harm [plaintiffs] fear' has already occurred."  In our circuit, we have also concluded that a private company's economic loss caused by delay in completing a project is irrelevant to the prejudice inquiry.  A lengthy, unexcused delay that does not result in prejudice is not a sufficient basis for laches to apply. "Difficulties caused by the pendency of a lawsuit, and not by delay in bringing the suit do not constitute prejudice within the meaning of the laches doctrine."

Save the Peaks, 669 at 1032-33 (citations and internal quotations omitted).

Here, the court concludes that Defendants fail to demonstrate sufficient prejudice warranting the application of laches.  Defendants contend that prejudice exits simply by the delay in construction of the project and the additional significant costs incurred by the Defendants.  Notably, construction has yet to occur on the site, and no identifiable funds have yet to be spent on construction.  In Save the Peaks, the Ninth Circuit rejected virtually the same arguments raised by Defendants herein.  The Ninth

13cv0178

Circuit determined that the following arguments do not demonstrate prejudice for purposes of laches: (1) delays and additional costs created by serial litigation, (2) project expenditures where no actual construction has occurred, and (3) loss of potential future income.  Id.  Moreover, the court notes that even without the CCC having commenced this action, no actual construction would have commenced as the NEPA issues raised in Navy Broadway II are still on appeal before the Ninth Circuit.

In sum, the court concludes that Defendants fail to demonstrate prejudice and therefore declines to bar this action based upon the doctrine of laches.

### III.  The Statute of Limitations

Manchester contends that this action is barred by the six-year statute of limitations of the APA.  See 28 U.S.C. §2401(a).  "To be 'final,' an agency action 'must mark the consummation of the agency's decisionmaking process—it must not be of a merely tentative or interlocutory nature.'  It must also be an action 'by which rights or obligations have been determined, or from which legal consequences will flow.'" Hells Canyon Pres. Council v. U.S. Forest Serv., 593 F.3d 923, 930 (9th Cir. 2010) (quoting Bennett v. Spear, 520 U.S. 154, 177–78 (1997)).  The filing of the June 2006 EA, Manchester contends, commenced the running of the APA's statute of limitation.

The court rejects this argument because, following remand in Navy Broadway I, the Navy prepared the March 2009 EA which specifically states that it "was prepared and supersedes the 2006 Final EA."  (AR 55681)  Thus, the final consummation of the decision making began, at the earliest upon the issuance of the March 2009 EA, within the APA's limitations period.  See Gov't of the Province of Manitoba v. Salazar, 691 F.Supp.2d 37, 49 (D. D.C. 2010) ("the FONSI ceased to be the agency's final action on February 3, 2005, when the Court remanded the EA to Reclamation and ordered the agency to revisit its finding of no significant impact").  As the CCC commenced the present action on January 2013, within the six-year statute of limitations, the action is timely.

In sum, the court finds this action timely filed within the limitations period of the APA.

## IV.  The CZMA Claims

As set forth above, the CZMA requires the preparation of a supplemental CD where the coastal uses and resources are substantially different than originally proposed. The regulations on the CZMA explain that:

> Substantially different coastal effects are reasonably foreseeable if:
>
> (1) The Federal agency makes substantial changes in the proposed activity that are relevant to management program enforceable policies; or
>
> (2) there are significant new circumstances or information relevant to the proposed activity and the proposed activity's effect on any coastal use or resource.

15 C.F.R. § 930.46(a).  Here, the CCC argues that substantial changes in the project and changed circumstances in the downtown area warrant the preparation of a supplemental CD.  Each is discussed in turn.

### 1.  Changes to the Project

The CCC contends that there are four substantial changes to the project that warrant a supplemental CD: (1) the sidewalk width on Harbor Drive; (2) the relocation of the proposed waterfront museum; (3) reduction of public recreational space from 4.97 to 4.21 acres; and (4) an increase in the number of employees that will work at the site.

### a.  The Sidewalks

The CCC concedes that the sidewalk on the east side of Harbor Drive for Block 4A is 25 feet.[2]  However, on Blocks 2A and 3A, without reference to the record, the CCC contends "that the sidewalk width on blocks 2A and 3A is now planned to be reduced by one-third."  (Motion at p.36:5-6).  While the CCC does not identify any specific provision requiring a 25-foot wide sidewalk on blocks 2A and 3A, it does

---

[2] The Guidelines state that, along Harbor Drive on Block 4, the sidewalk depth will be a consistent 25 feet.  (AR 2481, 3258).

13cv0178

identify an illustration that indicates that the sidewalks in these blocks are between 14.7 and 19.7 feet wide.  (AR 33571, 33610). With respect to the illustrations identified by the CCC, the court notes that the DA and Guidelines specifically state that the exhibits were intended to "illustrate potential development which may result from this" DA and Guidelines.  (AR 4816).  The exhibits, as opposed to the DA and Guidelines, are illustrative.  Further, the CCC does not argue that the sidewalk widths are inconsistent with the illustrations.

As a general proposition, the court notes that Defendants are obligated to comply with the DA and Guidelines and the CCC fails to specifically identify any portion of the DA and Guidelines that have been violated in any material or meaningful manner with respect to the sidewalk width.  (AR 4774, 4784-89, 35317).  Moreover, the CD specifically identifies a sidewalk width of 25 feet on Block 4.  (AR 2450).  The CD, DA, and Guidelines are silent on the sidewalk widths of the other blocks, although the illustrations identify a sidewalk width of less than 25 feet for all Blocks except Block 4.[3]  Further, the court notes that the redevelopment of the property as proposed will substantially increase public access and circulation through the site by opening up E, F, and G Streets.[4]

In sum, the court concludes that this perceived change to the project specifications, to the extent it exists, does not constitute a substantial or meaningful change to the NBC site within the meaning of 15 C.F.R. § 930.46(a) and the Navy's decision is neither arbitrary, capricious, nor contrary to law.

### b.  **The Museum**

The CCC contends that the relocation of the museum from Block 2A "located

---

[3] The CCC does not dispute that the sidewalk widths for all Blocks will be consistent with the illustrations.

[4] The court notes that the CCC does not identify the manner in which the proposed sidewalk widths in blocks 2A and 3A will impact pedestrian circulation in these areas.

near the waterfront in a visible and highly accessible location," (AR 2457), to Block 4 constitutes a substantial change in the project.  This argument is not persuasive.  The court notes that the DA permits the construction of the museum on all four blocks and that each site is located near the waterfront in a visible and highly accessible location.  The CCC simply fails to explain how the relocation from one portion of the project site to another DA-approved area adjacent to pedestrian walkways and plazas, across from Rococo Park, Seaport Village, and the Old Police Headquarters constitutes a substantial change to the NBC site.

In sum, the court concludes that the relocation of the museum from one Block to another Block, while a relocation from one portion of the site to another, is a modification permitted by the DA and Guidelines in the sense that the museum's footprint was not specifically fixed in the controlling DA and Guidelines.[5]  Seen in context, the relocated museum site does not constitute a substantial change to the NBC site within the meaning of 15 C.F.R. § 930.46(a) and therefore the decision by the Navy to relocate the museum is neither arbitrary, capricious, nor contrary to law.

### c.  Recreational Space

The CCC contends that the project provides 4.21 acres of public recreational space  whereas the CD indicated that public recreation would consist of 4.97 acres.  (AR 52199, 2459).  In a table, the CD indicates that the 4.97 acres consist of pedestrian facilities, galleries, and open space.  (AR 2459).  The CCC concludes that this is a loss of about .75 acres but fails to explain how this reduction is a substantial change, particularly where the body of the CD only identifies open space consisting of 1.9 acres of open space and 2.1 acres pedestrian and landscaped open space for a total of 4.0

---

[5] The CCC also argues that the "Navy relied on the museum and its location in 1990 to comply with the CCMP's mandate to provide and protect lower cost visitor and public recreational facilities." (Motion at p.31:21-23).  It is unclear from this argument how the relocation of the museum from one location on the site to another undermines lower cost visitor and public recreational facilities.  The court notes that the Project provides extensive public and open space, plazas, pedestrian walkways, and museum space that would not otherwise exist.

acres.  (AR 2442).  Further, the 4.21 acres of public recreation space is consistent with the CCC's own consistency determination that the open space would consist of 4.0 acres.  Id.  The court also notes that the NBC Project is creating 4 acres of waterfront and public space that do not currently exist.

In sum, the court concludes that this change, seen in context, does not constitute a substantial change to the NBC site within the meaning of 15 C.F.R. § 930.46(a) and therefore the Navy's decision is neither arbitrary, capricious nor contrary to law.

### d.  Increased Employment

The CCC contends that the estimated number of additional employees working on the site has been increased from 8,699 to 9,570, an increase of about 10%.  (AR 2155, 55806).  The court notes that the EIS and the 2009 EA estimate that 10,821 individuals will be employed at the site.  The Navy further explains that the net increase in employees is because there were fewer employees working at the NBC in 2009 when the 2009 EA was prepared (1,251) than there were when the 1990 EIS was prepared (2,122), (AR3118, 55806), and not because the Navy increased the number of employees who will work at the redeveloped site.  Seen in this light, there is no substantial change to the number of employees working at the site.

In sum, the court concludes that this change, in context, does not constitute a substantial change to the NBC site within the meaning of 15 C.F.R. § 930.46(a), and therefore the Navy's decision is neither arbitrary, capricious, or contrary to law.

### e.  Conclusion/Cumulative Impacts

Considering the individual and cumulative impact of actual or perceived changes in certain sidewalk widths, the relocation of the museum, changes in open space areas, availability of lower cost visitor and recreational facilities, and perceived increased employment, the court is unable to conclude that the Navy's determination that these changes do not constitute substantial changes to the NBC site within the meaning of 15 C.F.R. § 930.46(a) is arbitrary, capricious, or contrary to law.   The changed

1   circumstances in the project as identified by the CCC fail to recognize that the project,

2   as originally contemplated in the DA and Guidelines, remains virtually the same.  The

3   CCC simply fails to identify any impacts to the coastal zone environment caused by the

4   actual or perceived changes to the project.  Seen in this light, the court cannot conclude

5   that the Navy's determination that no supplemental CD is required under circumstances

6   relevant to any actual or perceived changes to the project, is arbitrary, capricious, or

7   contrary to law.   As such, there is no basis to require the Navy to prepare a

8   supplemental CD.

9        2.  Changes in the Downtown Area

10       The CCC contends that "new significant circumstances and information, viewed

11  independently or collectively, show that it is reasonably foreseeable that the Project will

12  affect public access, recreation, lower cost visitor facilities, and traffic and parking

13  along the coast substantially different than described by the Navy in its 1990 Coastal

14  Consistency Determination for the Project.  A supplemental consistency determination

15  under 15 C.F.R. § 930.46(a) is required, and the Navy's decision not to prepare one is

16  unlawful. See 15 C.F.R. § 930.46(a)(2)."[6]  (Motion at p.16:15-21).  The CCC argues

17  that the following changed circumstances warrant a supplemental CD: (1) more

18  intensive development has occurred and is planned for downtown San Diego, including

19  new projects and attractions in the downtown area; (2) the Midway museum attracts

20  about 850,000 visitors annually; and (3) increased traffic and parking and decreased

21  scenic and visual qualities.  Each is discussed in turn.[7]

22  _____

23       [6] The court notes that the CCC appears to misconstrue the nature of this court's inquiry.  As
    stated above, the role of the court is simply to determine whether the Navy's decision that no
24  supplemental CD is required under 15 C.F.R. § 930.46(a)(2) is arbitrary, capricious, or contrary to
    law. See 5 U.S.C. §706(2)(A).  The court is not to substitute its judgment for that of the Navy.

25
        [7] The court notes that the NBC Project is defined by the DA and that Manchester is obligated
26  to develop the Project in accordance with the DA and Guidelines.  Any substantial change to the
    Project would violate the DA.  When the CCC approved the CD in October 1991, it specifically
27  acknowledged that the redeveloped NBC site must be consistent with the DA and Guidelines.  (AR
    3746).  While the CCC raises challenges based upon perceived or actual changes to the project or
28  changed circumstances in the downtown core, the CCC does not identify how the perceived or actual

## a. **More Intensive Development**[8]

As set forth in the 2009 EA, all parties recognize that "the downtown San Diego area surrounding the property has experienced considerable growth, including the construction of numerous residential and commercial towers as well as the mooring of the USS Midway Aircraft Carrier Museum." (AR 55698-99). The 2009 EA considered projections set forth in the 1992 Community Plan and the 2006 Community Plan for downtown San Diego. (AR 25798, 55699, 55914-17). The Community Plan considered the redevelopment of the NBC site and considered the additional amenities afforded by the redeveloped NBC site to residents and visitors to San Diego. Furthermore, the Navy's October 17, 2011 letter to the CCC explained the rationale and reasoning for its conclusion that a supplemental CD was not required for the NBC. (AR 52194-217). New circumstances are not significant for CZMA purposes unless they cause adverse environmental consequences to coastal uses or resources. See Del. Dep't of Natural Resources, 685 F.3d at 287; 15 C.F.R. §930.46(a)(2).

The CCC argues that the differences in estimates of development set forth in the 1992 Community Plan and the 2006 Community Plan are substantial. While not precise comparisons, the 1992 Plan projects through 2025 and the 2006 Plan projects through 2030, increases in residential and retail growth use projections are notable, while a decrease in industrial use is similarly notable. (CCC Motion at p.20, Table B). The 2006 Plan states: "Beginning in the early 2000s, an unprecedented boom in residential development occurred, driven by opportunities for waterfront and urban living." (AR

---

changes are not consistent with the DA and Guidelines.

[8] In analyzing perceived changed circumstances in the downtown area, the court and parties are aware that "[q]uantifying the actual difference between the development which was anticipated in the early 1990s to occur in the future, to the development that has actually occurred, is difficult because there is a lack of information in the record." (CCC Reply at p.19:16-18). Estimated future development in the downtown area is not subject to precise calculation due to both anticipated and unanticipated variables.

22518).[9]  The CCC acknowledges that the 1990 CD identifies that the demand for access and recreation along the coast associated with the NBC project would increase and that such demand would be met without jeopardizing coastal resources.

In broad brush, the CCC argues that a supplemental CD is required to account for (1) increased projected development as set forth in the 2006 Community Plan, (2) the changes in recreational facilities in the area since 1990, and (3) the substantial growth of foreseeable demand for coastal access and recreation use since 1990.  The parties do not dispute that changes in development have occurred since the issuance of the 1990 CD.

The CCC fails to address the following critical inquiries.  First and foremost, the Administrative Record demonstrates that the Federal Defendants have repeatedly and thoroughly addressed the development changes identified by Plaintiff in the downtown area.  The 2006 and 2009 EAs and the multiple correspondence between the CCC and the Navy show that the changes in the area surrounding the NBC project have been considered and determined not to be significant such that a supplemental CD is required.  The CCC fails to set forth an informed basis from which this court may conclude that the Navy's determination is arbitrary, capricious, or contrary to law.   In other words, the CCC fails to articulate how a supplemental CD will lead to a different outcome when the increases in development have already been considered.  Second, with respect to the coastal lands within its jurisdiction, the increases in development have been approved by the CCC.  In this sense, the CCC is in a superior position than the Navy to control and manage coastal development before it occurs.  Where, like here, the NBC project has not undergone any substantial modifications in the scope of development and obtained a CD, and the CCC has subsequently approved coastal uses leading to increased development, it is somewhat disingenuous for the CCC to now

_____

[9] The court notes that projected estimated growth made in 2006 is based upon information known at that time and does not account for unseen events such as the Great Recession, which may, or may not, dramatically and permanently alter the pace of development.

argue that dramatic and "striking" increases in development are unanticipated when it approved many of those developments in the first instance.

The court highlights that increased development in residential units and population, employment, commercial uses, and retail uses were considered by the Navy, including PETCO park, the Convention Center Expansion, the Hyatt 2nd Tower, and the Broadway Cruise Ship Terminal. These developments were either considered in the 2009 EA, the 2006 EA, or in communications with the CCC. (AR 55906-19, 25827-32, 52209-16). While the CCC characterizes the development projections as "striking" or "remarkable," (CCC Motion at p.19:15-16), the Navy determined that the project would ameliorate the impact of additional residential development (the use with the highest projected growth) explaining that it "would contribute to a needed supply of commercial and retail uses that would support the surrounding residential development and waterfront uses." (AR 25828, 55731). The Navy also concluded that the project would "provide needed public services and park space to the surrounding residential community." (AR 52214).

The Navy further concluded that the project would benefit public access and recreation along the waterfront by opening up access through the redeveloped NBC (the present site provides no waterfront access). (AR 52211-14). With regard to PETCO park, the Navy concluded that it would have minimum impact because the effects are limited to game days and its effects primarily located to the PETCO park area. Id. The Navy also considered the convention center expansion and concluded that it would not have substantial effects on public access or recreation along the waterfront. Id.

The Navy has considered the new residential, commercial, and recreational developments identified by the CCC; analyzed these developments and concomitant impacts on parking, traffic, aesthetics, and viewshed; and concluded that the impacts do not constitute a significant change requiring a supplemental CD. In reviewing the Navy's analysis, it is not the role of the court to substitute its judgment in place of learned and experienced individuals with specialized knowledge in the field. The

Supreme Court instructs that the court is not to substitute its judgment for that of an agency and "should uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." <u>Bowman Transp., Inc. v. Arkansas-Best Freight System Inc.</u>, 419 U.S. 281, 286 (1974).   Here, after careful consideration of the coastal and environmental impacts of development in downtown San Diego, the Navy's determination regarding the impact of higher intensity development on the redeveloped NBC project is neither arbitrary, capricious, nor contrary to law.

In sum, the court concludes that the Navy's determination that higher intensity development in downtown San Diego does not constitute a substantial change to the NBC site within the meaning of 15 C.F.R. § 930.46(a) is neither arbitrary, capricious., nor contrary to law.

### b.  <u>The Midway Museum</u>

The CCC contends that the installation of the Midway Museum somehow requires the preparation of a supplemental CD.   In 2001 the CCC approved the installation of the U.S.S. Midway Aircraft Carrier across from the NBC site.   The museum opened in 2004 and draws about 850,000 visitors per year.[10]   The CCC argues that the Midway Museum has substantially fostered coastal access and that its impact on the NBC has not been considered in the DA.   The Midway Museum is located in front of the NBC site and was not anticipated when the Navy and the CCC reviewed the project in 1990 and 1991.   Under these circumstances, it is reasonably foreseeable, the CCC argues, "that the additional persons brought to the waterfront by the Project will have a substantially greater impact on the public's ability to access and recreate along the coast.   The additional persons from the Project could burden coastal access and recreational opportunities."   (CCC Motion at p.27:5-8).

Here, the record demonstrates that the Navy considered the coastal and

---

[10] Presumably, when the CCC approved the installation of the Midway Museum it considered the coastal impacts of the Midway Museum, the NBC project, and future development in the downtown area.  As the CCC noted at the time of oral argument, the Midway was originally expected to draw about 650,000 - 700,000 visitors annually.

13cv0178

environmental impacts of the Midway Museum.  As highlighted by the Navy, the CZMA does not require the Navy to consider the impacts of the Midway on coastal resources.  Rather, the issue concerns the coastal impacts of the redeveloped NBC site in light of surrounding developments, one of which is the Midway Museum.  The Navy has specifically considered the Midway Museum in its environmental analysis.  The 2009 EA, for example, notes that the Midway Museum is one aspect of the considerable growth experienced in the downtown area.  (AR 55698, 56656-57).  Further, in its October 11, 2011 letter to the CCC, the Navy considered and explained that the right-of-way along E and F streets would, as set forth in the DA, be maintained.  The Navy also considered that the NBC project would provide greater access and maximize views.  (AR 52210-11).

The responses to public comments concerning the Midway Museum shed light on the development of that property.  When CCC approved the Midway Museum,  it concluded that "the creation of a public park on the Navy Pier would improve the visual quality of the North Embarcadero area, thereby mitigating adverse visual impacts of the carrier."  (AR 56656).  The CCC also considered that the redeveloped NBC site would open up visual corridors.  Id.  With respect to parking, the comments also noted that the Midway Museum was required to set aside upland parking, thereby permitting use of the area for public space.  (AR 56657).  As the Navy considered the coastal impacts of the Midway Museum on the NBC, and the impacts of the NBC on the Midway Museum, the court concludes that the Navy's determination is neither arbitrary, capricious, nor contrary to law.

In sum, the court concludes that the Navy's consideration and determination that the Midway Museum does not constitute a substantial change to the NBC site within the meaning of 15 C.F.R. § 930.46(a) is neither arbitrary, capricious, nor contrary to law.

### c.  Traffic, Parking, and Visual Resources

Perhaps the subjects of traffic and parking reveal best the result-driven positions

13cv0178

taken by the CCC.  The CCC argues that the 2006 Downtown Community Plan ("2006 Plan") estimates that the shortage in the number of parking spaces by 2030 may be about 35%.  (AR 21634).  From the 2006 Plan, the CCC extrapolates that "there will not be enough spots for people to park when they want to drive to the coast near the NBC site.  This impact is significant new information relevant to the Project's effect on parking in the coastal area."  (CCC Reply at p.25:1-4). The 2006 Plan covers the entire downtown San Diego area, does not identify any parking shortage along the coastal area, and anticipates that several variables may significantly undermine the estimated shortage in the number of available parking spaces.  Further, the CCC ignores the CD and the NBC's compliance with the City of San Diego's parking requirements.  The CD provides:

> The TDM (transportation demand management) program has not yet been developed by the Navy.  However, the Navy argues that Commission's review of the final TDM must meet the City's requirements and is subject to monitoring by the City.

(AR 3746).  The CCC raises no suggestion that the Navy has not fully complied with the TDM.

Moreover, the Navy fully considered this issue and explained to the CCC in February 2007 its compliance with the patterns and intensification of uses and traffic in the downtown shoreline area and that the number of trips associated with the NBC project would be 30% less than originally estimated because of a reduction in density. Further, while acknowledging that certain traffic and parking impacts are significant and unmitigable (this is the same situation as existed in 1990), the Navy noted that the areas most impacted by traffic, and to a certain extent parking, were intersections and interstate ramps outside the coastal zone and that the majority of waterfront travel would occur on the weekends, which would not be impacted by weekday peak-hour traffic and, presumably, at a time when additional parking spaces would be available in office buildings.  (AR 32503-04).

Moving on, however, the CCC contends that the Navy failed to adequately

consider other impacts of parking, traffic, and visual resources.  The CCC also argues that the 55,000 square-foot museum and 1.9 acre public park will generate additional traffic not considered by the Navy.

The primary difficulty with the CCC's arguments is that the Navy has considered and analyzed the impacts of traffic, parking, and visual resources.  The record demonstrates that the Navy has addressed the CCC's concerns in the 2006 and 2009 EAs and in correspondence with the CCC in 2007, 2009, and 2011.  (AR 25834-50, 32503-06, 55738-55, 56655-67).  While the cumulative impacts to parking may be unmitigable, as identified in the Downtown Community Plan, the Navy explained in the 2009 EA that parking spaces will be provided in accordance with the DA and exceed the minimum parking then required by the Centre City Planned District Ordinance. (AR 52208-09, 52293, 55751, 56659, 57314).  The record also reveals that there is increased public transportation in the downtown areas, including the addition of two trolley lines and rail passenger service. (AR 55743). Further, with increased residential development in the downtown San Diego area, the demand for parking in this area is less than elsewhere in San Diego, (AR 55751), and the Midway Museum was required to provide upland parking.  (AR 56657).

With respect to visual resources, the CCC argues that the "downtown coast has become substantially fuller and bulkier" since the early 1990s.  (CCC Motion at p.29:21-22).  The CCC argues that the existence of the Midway Museum, the Broadway pier, PETCO park, the second Hyatt Tower and the buildings on the NBC site "will now be too much to bear" and requires the preparation of a supplemental CD.  (Id. at 30:14-15).  The court notes that the CCC, in its determinations concerning the Midway Museum, noted that the redeveloped NBC site would open up a view corridor along E Street.  (AR 56656).

The court rejects the CCC's arguments.  The CCC found that the redeveloped NBC site will enhance views to the coast primarily because E, F, and G Streets would be open to the public. (AR 3727-30).  Further, with respect to the new developments

in downtown San Diego, the Navy considered these projects in the 2006 and 2009 EAs and the 2007 and 2011 letters to the CCC.  (AR 24837, 32503-06, 52194-218, 55718-22, 55727-31, 55738-75, 55906-14, 55663-65).  Finally, the court notes that the impact of visual resources was considered in <u>Navy Broadway II</u> wherein it concluded that the 2009 EA sufficiently considered the "visual environment of the NBC area," including the cruise ship terminal, piers, and other waterfront developments.

In sum, the court concludes that the Navy's consideration and determination of issues related to parking, traffic, and visual resources do not constitute a substantial change to the NBC site within the meaning of 15 C.F.R. § 930.46(a) is neither arbitrary, capricious, nor contrary to law.

## C.  CONCLUSION

Having carefully considered the arguments of counsel, the Administrative Record, and pertinent authorities, the court grants Defendants' motion for summary judgment and denies Plaintiff's motion for summary judgment.  The court concludes that the actual and perceived changes in the scope of the project and in the relevant downtown area are not, either individually or cumulatively, substantially different than originally proposed within the meaning of 15 C.F.R. §930.46(a).  The Clerk of Court in instructed to enter judgment in favor of Defendants, and against Plaintiff, on all claims and to close the file.

**IT IS SO ORDERED.**

DATED:  May 28, 2014

Hon. Jeffrey T. Miller
United States District Judge

cc:          All parties

- 31 -

13cv0178